## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION

LYNANNE WARE, on behalf of herself and all others similarly situated,

Plaintiff,

vs.

RELIAS, LLC

Defendant.

Case No. :

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff LynnAnn Ware ("Plaintiff"), individually and on behalf of all other similarly situated persons, brings this action against Relias, LLC ("Relias" or "Defendant") for its violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or "the Act"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Meta"), information which identifies the prerecorded audio visual material Plaintiff and similarly situated subscribers request or obtain from Defendant's website, https://www.nurse.com/ et. al.[1] (the "Website"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts, upon investigation of counsel, and upon information and belief as to all other matters.

### NATURE OF THE CASE

1. Plaintiff brings this consumer privacy class action to protect the privacy rights granted to her under federal law—rights Relias violates by knowingly disclosing its subscribers' personally identifiable information to Meta. Specifically, Defendant knowingly discloses its subscribers' personally identifiable information ("PII") to Meta which includes their identities

---

[1] Plaintiff's claims include not only the root website https://www.nurse.com, but also any page included within the Website (e.g., https://www.nurse.com/nursing-ce-courses).

alongside the titles of the prerecorded audio visual materials they request or obtain from the Website.

2. Relias owns and operates https://www.nurse.com/, through which it offers continuing medical education in the form of audio visual materials, including prerecorded videos and webinars.

3. The VPPA prohibits "video tape service providers," such as Defendant, from "knowingly disclos[ing]" consumers' personally identifiable information ("PII"), defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C.A. § 2710.

4. Defendant transmits the PII to Meta via the Meta Pixel (the "Pixel"[2])— software Defendant purposefully and knowingly deployed across its Website that provides data to Meta regarding interactions Relias's consumers take on the Website.

5. Relias knowingly discloses to Meta identifying information including a subscriber's Facebook ID ("FID") (a number assigned to each Facebook profile which, by itself, makes the profile identifiable) alongside the title of the prerecorded audio visual material subscribers request or obtain from the Websites. Because the records Relias shares with Meta contain both (i) a subscriber's FID and (ii) the title of the prerecorded audio visual material he or she requests or obtains, they constitute PII under the VPPA.

6. Defendant's disclosure of these records to Meta via the Pixel occurs within a single transmission including both the FID and the video title. A subscriber's FID uniquely identifies his or her Facebook profile, and the FID alone is capable of identifying the particular user by his or

---

[2] 'Pixel' as used herein means the collective Pixels Defendant installed on the Websites. The Facebook Pixel IDs associated with the Pixels on the Website are 284235044490595, 440069159523561.

her Facebook profile. Therefore, Meta can easily view the particular subscriber's corresponding Facebook profile.

7.     Defendant did not install the Pixel by accident, nor without an understanding as to its purpose or its function. To access the code necessary to install its Pixel required Defendant to visit Meta's webpage which publishes comprehensive information describing the Pixel's operation. Defendant installed the Pixel to obtain its benefits – enhanced marketing outcomes leading to increased visitors and higher revenue.

8.     Throughout the relevant time period, any person could link Plaintiff's unique FID to her Facebook page which publishes personally information making her identifiable, such as her name, photographs of her, and her educational history.

9.     Upon information and belief, Defendant may also disclose Plaintiff's PII via Meta's Conversions API ("CAPI"), a server-side technology which shares users' website interactions and personal information with Meta directly from the website host's server.

10.     On behalf of herself and all similarly situated subscribers of Defendant, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of subscribers' PII; awarding liquidated damages in the amount of $2,500 per violation, attorneys' fees, and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES

11.     Plaintiff LynnAnn Ware is an individual who lives and is domiciled in Coatesville, Pennsylvania and is a subscriber of nurse.com. Throughout the class period she requested and obtained prerecorded audio visual material on the Website using her Internet-connected device and web-browsing software installed on that device. Plaintiff Ware is a Facebook user with a unique Facebook profile page throughout the entire class period.

12.　Plaintiff registered an account on the Website by providing Defendant with her first name, last name, email address, specialties, degree, phone number, and zip code. She used her account to purchase an Unlimited CE Subscription, which granted her "access to the full Nurse.com CE library of over 1000 ANCC accredited courses."[3] Only by providing such information could she obtain such a subscription.

13.　Defendant, Relias, LLC, is headquartered in Morrisville, North Carolina. Defendant owns and operates the Websites through which it collects the PII of its subscribers and knowingly discloses their PII to third parties, including Meta. Defendant is "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," and accordingly falls within the VPPA's definition of "video tape service provider." 18 U.S.C. § 2710(a)(4).

---

[3] Nurse.com, *Nurse.com CE Packages* https://www.nurse.com/sign-up (last accessed January 2, 2025).

14.     Defendant's Website carries over one thousand online continuing education courses featuring audio visual materials on dozens of topics relevant to every nursing discipline and the nursing profession in general.


*Figure 1*

15.     Defendant uses subject matter experts, including practitioners and industry leaders to produce courses tailored to meet nurse licensing requirements for all 50 states as well as Guam, Puerto Rico, the U.S. Virgin Islands, and Washington D.C.

## JURISDICTION AND VENUE

16.     Defendant is subject to personal jurisdiction in this Court: Defendant has purposefully availed itself of the privileges of conducting business within this District, Plaintiff claims relate to Defendant's forum-related activities, Defendant is headquartered in this District, and according to the Website's Terms of Service, federal or state courts located in Wake County,

North Carolina shall have exclusive personal jurisdiction over any dispute related in any way to the Website.[4]

17.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

18.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, and pursuant to the Website's Terms of Service which states all disputes related to use of the Website shall be filed in courts located in Wake County, North Carolina.[5]

## COMMON FACTUAL ALLEGATIONS

### I.     The VPPA

19.     The VPPA is a robust privacy statute, providing broad protection for video watching behavior. It prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1).

20.     The VPPA was enacted in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C. newspaper during his confirmation hearings. The profile contained a list of 146 films that Judge Bork and his family rented from a video store. Members of Congress denounced the disclosure as repugnant to the right of privacy.

21.     Then Senator Leahy, one of the senators who introduced the VPPA Legislation, commented on the profile during the nomination hearing: "It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when

---

[4] *Nurse.com, a Relias LLC brand, Terms of Service*, https://www.nurse.com/terms-of-service (last visited January 17, 2025).
[5] *Id.*

they are home." S. Rep. No. 100-599, at 5-6. "Privacy is not a conservative or liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id*.

22.    The VPPA was introduced by a bipartisan group of Senators "[t]o preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials," and it "reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." S. Rep. No. 100-599, at 1, 8.

23.    While the concerns about privacy were undoubtedly true in 1988 when the VPPA was passed, the importance of privacy legislation in the modern era of data mining is more pronounced.[6] Indeed, during a 2012 Senate Judiciary Committee meeting entitled "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

24.    Courts have no trouble holding that violations of the VPPA cause sufficiently concrete harms and bear a close relationship to traditional privacy harms actionable in English and American courts, including intrusion upon seclusion and disclosure of private facts.

---

[6] Congress "did not intend for the VPPA to gather dust next to our VHS tapes. Our modern means of consuming content may be different, but the VPPA's privacy protections remain as robust today as they were in 1988." *Salazar v. National Basketball Association*, 118 F.4th 353, 553 (2d. Cir. 2024)

25.     Plaintiff alleges Defendant shared her private information with an unauthorized third party when it transmitted her video-watching behavior to Meta. This act constitutes an invasion of privacy that is highly offensive to a reasonable person.

26.     Plaintiff does not merely allege exposure of such sensitive information to Meta, but that her information was disclosed to Meta subject to an arrangement between Defendant and Meta pursuant to which Defendant deliberately uses the Meta Pixel.[7]

27.     Plaintiff's allegations fall squarely within the scope of interests protected by the VPPA, which "seeks redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private."[8]

28.     The right of privacy in the prerecorded audio visual material one requests or obtains is inviolate.

## II.     Defendant Violates the VPPA

### a.     Defendant's Subscribers are "Consumers" Under the VPPA

29.     Defendant invites users to become subscribers to its Website by asking them to pay the required subscription fee and submit their personal information and contact information, including full name, email address, phone number, location, education, and specialties. Becoming a subscriber makes the individual identifiable to Defendant and provides a method by which Defendant can contact subscribers.

30.     In addition to the information Plaintiff provided to Defendant to register her account and access content, Defendant collects additional data from Plaintiff when she interact with the

---

[7] *See id.* at 542.
[8] *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 274 (3d. Cir. 2016); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th. Cir. 2017) (holding violations of the VPPA cause concrete injury).

Website, including but not limited to, her device identifiers, IP addresses, and information about her browser.[9]

31.     By providing such personal information to Defendant, Plaintiff and class members obtain access to audiovisual content unavailable to non-subscribers, as well as additional information in the form of email notifications regarding news, career opportunities, and personalized course recommendations.

b.     Defendant Shares its Consumers' PII with Meta

i.     *Defendant's Pixel*

32.     The Pixel is a unique string of code that operates to share subscribers' online activity with Meta,[10] which Meta uses to create unique, detailed profiles filled with highly personal inferences about the subscribers, such as their "interests," "behavior," and "connections."[11]

33.     A website or online business which places advertising on Meta's platform, such as Defendant, is encouraged to install a Pixel because, through the Pixel, Meta can more accurately target the website's advertising to specific users.[12]

---

[9] *See* Nurse.com, *Nurse.com Privacy Policy* https://www.nurse.com/privacy-policy (last accessed January 2, 2025).

[10] Meta for Developers, *Meta Pixel*, Meta https://developers.facebook.com/docs/meta-pixel/ (last visited November 4, 2024); Meta for Developers, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, Meta https://www.facebook.com/business/goals/retargeting (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.") (last visited November 4, 2024).

[11] Meta, *Audience Ad Targeting: How to find people most likely to respond to your ad*, Meta for Developers (2024), https://www.facebook.com/business/ads/ad-targeting (last visited January 30, 2024).

[12] Meta, *Retargeting*, Meta https://www.facebook.com/business/goals/retargeting (last visited October 29, 2024).

34.     Pivotal to the Pixel's effectiveness is its ability to associate a user's interactions on websites across the internet with that specific user's Facebook profile. In fact, this is the fundamental purpose the Pixel serves: it continuously adds data from new interactions to the historical profiles Meta maintains on individuals with Facebook profiles. Each interaction sent to Meta due to the Pixel (including by Defendant), is linked to and cross-referenced with all of the personal information Meta possesses about the user.

35.     The Pixel (including Defendant's Pixel) operates as follows: First, a user, through his or her browser, visits a website on which a Pixel is operational and requests information. In response to the user's request, the website instructs the user's browser what to display on the screen (i.e., content, products for sale, boxes with buttons that can be clicked, shopping carts, etc.). In addition to instructing the browser to load such content, the website instructs the browser to load the Pixel.

36.     Like the webpage, the Pixel's code includes instructions for the user's browser, and instructs the browser to contact Meta with a report of what actions the user is taking on the webpage. These instructions inform the browser that certain actions taken by a user, such as viewing a page or clicking a button, should be shared with Meta in the form of a URL (see Figures 3a and 3b, below). To take it one step further, the Pixel instructs the browser to send to Meta an identifier that accompanies the URL—the FID, which is stored in the c_user cookie. Because the browser encounters the Pixel and downloads its instructions, it necessarily transmits this information to Meta.

37.     The Pixel instructs the browser to send to Meta transmissions that include two primary datapoints chosen by the website owner, like Defendant: "events" (user interactions, such as viewing pages, clicking buttons, or adding products to a shopping cart) and "identifiers" (such

as a Facebook user's Facebook ID). Because the Pixel is embedded within every subordinate page of Defendant's website, every page a subscriber visits instructs the browser to transmit information to Meta. This gives Meta a detailed view of a subscriber's use of Defendant's website.

38. Integral to this process, as detailed below, is that the website owner affirmatively installs a Pixel within its code for the exact purpose of creating these URLs and sharing them with Meta, because this process is how Meta can learn whether specific users are shown an advertisement and follow the advertisement through to view and/or purchase a product.

39. But for the website host's installation of the Pixel, a user's browser would not have reason to share the user's online browsing behavior or PII with Meta.

40. Critically, the Pixel can recognize Defendant's subscribers even when they visit other websites across the Internet - and even after a subscriber clears his or her browser history.

41. The Pixel allows Meta to learn (i) any websites users visit (in general), (ii) how often users visit websites and the interactions they take on them, and (iii) which kinds of advertisements each specific user positively responds to (i.e., such as by clicking on it and/or following it through to purchase the advertised product).

42. After users' activity is transmitted to Meta via the Pixel, Meta compiles the information to pinpoint personalized "audiences" that consist of individuals who are likely to respond to particular advertisers' messaging, improving the ability of businesses to serve specific (i.e., "targeted") subscribers with personalized advertisements. This improves the accuracy and effectiveness of a business's advertising campaigns.

43.     In addition to the information every user is required to provide to Meta when creating an account (including First and Last name, date of birth, gender, email address and/or mobile number, and password), Meta also possesses and has access to all of the information a user posts on his or her Facebook profile.



*Figure 2*

44.     Information about a website's users becomes the currency by which Meta and said website exchange value;[13] websites provide information to Meta, and in exchange, Meta provides

---

[13] See Ben-Shahar, Omri, *Privacy is the New Money, Thanks to Big Data*, Forbes, https://www.forbes.com/sites/omribenshahar/2016/04/01/privacy-is-the-new-money-thanks-to-big-data/?sh=2229e4853fa2 (last visited Feb. 6, 2024) ("We don't pay old money to use Facebook, Google search, CNET, or Forbes.com. Instead, each of these websites competes for our New Money currency—collecting mountains of information about us when we use their services and commercializing their databases.").

unmatched advertising capabilities to Defendant. Meta promotes its pixel as a tool to "[f]ind new customers… Drive more sales… [and] reach people who are more likely to take an action you care about, like making a purchase."[14] In fact, it is this very business model that has Meta on pace to earn almost *$150 billion* in advertising revenue in 2024.[15]

45. It comes as no surprise then, that information about such individuals—and their online interactions—has real value. For example, one study by content marketing agency Fractl[16] found that personal information for individuals can be sold for $1,200 on the dark web, and individuals can now sell access to their own online behavior through various entities who pay users for their personal information.

46. By installing its Pixel, Defendant transmitted each of Plaintiff's interactions on the Website to Meta via its Pixel. Meta can instantaneously associate each interaction with Plaintiff's personal information that she submitted when creating her account, any personal information available on her Facebook profile, and all prior data in the profile Meta built for her based on prior online interactions.

47. Approximately seven-in-ten U.S. citizens have a Facebook profile[17] – all of whom provided the same personal information to Meta when creating their Facebook profiles. Meta

---

[14] Meta Business Help Center, *About Meta Pixel*, Meta (2024) https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited October 16, 2024).

[15] Meta Investor Relations, *Meta Reports Second Quarter 2024 Results*, Meta (July 31, 2024) https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Second-Quarter-2024-Results/default.aspx (last visited October 29, 2024).

[16] Maria LaMagna, The sad truth about how much your Google data is worth on the dark web, MarketWatch (June 6, 2018), https://www.marketwatch.com/story/spooked-by-the-Facebook-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20 (last visited April 24, 2024).

[17] Schaeffer, Katherine, *5 Facts about how Americans use Facebook, two decades after its launch*, Pew Research Center, (February 2, 2024) https://www.pewresearch.org/short-

promotes its ability to allow businesses to target their ads to specific audiences using these types of identifying information[18] as well as information about actions specific users have taken on the businesses' websites.[19]

48.    In sum: the Pixel is a tool a website can install to gather data about its users and share that data with Meta in return for more effective placement of its online ads.

ii.    *Defendant's Pixel Operated as Intended*

49.    As stated above, the Pixel collects information about the users that visit a website on which it is installed and transmits the information to Meta. The method and manner in which Defendant configured its Pixel to transmit this information to Meta constitutes a disclosure of the personally identifiable information of its subscribers because each video requested or obtained (an "event") by each unique subscriber (through an "identifier") is disclosed to Meta.

50.    A FID is a unique and persistent identifier that Meta assigns to each of its users. With nothing but a user's FID in hand, Meta can view that user's unique Facebook profile. In fact, any person in possession of nothing more than a user's FID can locate the user's unique Facebook profile with the execution of one simple command within an internet browser (i.e., entering www.facebook.com/[FID] within the browser). A FID is nothing short of a link to the user's Facebook profile.

---

reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last accessed October 15, 2024).
[18] Meta Business Help Center, *Age and gender*, Meta, https://www.facebook.com/business/help/151999381652364 (last accessed October 15, 2024); See also Meta Business Help Center, About specific targeting, Meta, https://www.facebook.com/business/help/121933141221852?id=176276233019487 (last accessed October 15, 2024).
[19] Meta Business Help Center, *Options to create a website custom audience*, Meta, https://www.facebook.com/business/help/2539962959620307 (last visited October 15, 2024).

51.    These two pieces of information are transmitted to Meta, via the Pixel, for every interaction it tracks. Thus, on *every* occasion on which the Pixel transmits information to Meta, an identifier is connected to and/or linked with the event in question—including when the event demonstrates that the user requested or obtained audio visual materials. When the transmission includes such information, it discloses the user's PII to Meta in violation of the VPPA.

52.    Upon receipt of that transmission containing the URL, the name of the video content a subscriber requested or obtained, and the FID – all of which Defendant knowingly discloses to Meta—Meta learns the identity of the subscriber and the specific prerecorded audio visual material he requests or obtains from the Website.

53.    Through the Pixels it installed on the Websites, Defendant knowingly disclosed to Meta both the title of the prerecorded audio visual material a subscriber requested or obtained and the subscriber's FID in one single network transmission. Meta needs no additional information to connect a subscriber to the prerecorded audio visual material they requested or obtained on Defendant's Website. This transmission is depicted in the below example:



*Figure 3-a*[20]



*Figure 3-b*

---

[20] Figures numbered as "a," "b," and "c" indicate they are views from the same network traffic.

54.     In this example, Defendant knowingly disclosed to Meta that Allen Carney[21] requested or obtained Defendant's prerecorded audio visual material "Your Wellness Journey: Unlocking the Root Cause of Your Burnout."

55.     The FID is displayed as a numeric value referred to as the "c_user." The FID associated with Allen Carney's Facebook profile is "61567865736804."

56.     The disclosure of the FID is coupled with the title of the prerecorded audio visual material the subscriber requested or obtained within the URL transmitted to Meta:



---

[21] For the purposes of demonstrating how the Pixel transmits video titles alongside the user's FID in the c_user cookie, the screenshots in Figures 2-4, 6 show the network traffic from watching videos on nurse.com from the same browser used to log into the Facebook account for Allen Carney.

*Figure 3-c*

57.     Through this transmission, Meta uniquely identifies the subscriber requesting or

obtaining the prerecorded audio visual material "Your Wellness Journey: Unlocking the Root Cause

of Your Burnout." This individual is identifiable to any ordinary person in possession of this

information because submitting "Facebook.com/61567865736804" into a browser's search bar

(and nothing more), as illustrated by Figure 4, will direct the browser to populate Allen Carney's

Facebook profile page, as can be seen in Figure 5.



*Figure 4*



*Figure 5*

58.     Just as depicted above for Allen Carney, this process occurs in exactly the same

way for any Facebook user visiting the Website. Every time those users watch a video, Defendant

transmits the title of the audio visual material they requested or obtained in conjunction with their

FID.

59.     The PII shared by Defendant is personal and unique to Plaintiff and each Class member. Defendant's choices also affect Plaintiff and Class Members' control of information concerning their person. "Most Americans hold strong views about the importance of privacy in their everyday lives,"[22] and 93% of adults believe it is important to have control over who can access information about them.[23]

60.     The VPPA establishes a right to privacy in U.S. citizens' PII regardless of the medium through which prerecorded audio visual material is requested or obtained. It imposes responsibilities on video tape service providers, like Defendant, to limit disclosure of PII.

61.     By knowingly disclosing its subscribers' PII to Meta, Defendant violates their privacy rights protected by the Video Privacy Protection Act.

62.     As demonstrated in the above Figures 3-5, Defendant's Pixel operated exactly as it was designed – providing Meta with a link to Plaintiff's and the class members' Facebook profiles identifying the audio visual materials requested or obtained from the Website.

c.     *The Conversions API*

63.     Upon information and belief, Defendant may have also configured a Meta product called the Conversions API to share information about user interactions on its website with Meta.

64.     CAPI operates directly from Defendant's server to transmit such information, unlike the Meta Pixel, which operates from within Defendant's website code and forces the user's browser to share information with Meta.

65.     CAPI tracks users' interactions with the webpage, including their requests to view audio visual material, and personal information about them. It stores such information on the

---

[22] Mary Madden & Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance*, Pew Res. Ctr. (May 20, 2015) *see also* EPIC, *Public Opinion on Privacy* (2018).
[23] *Id.*

website owner's servers and transmits to Meta directly from its server, as opposed to the Pixel's operation, which shares such information by coopting the user's browser and forcing the browser to transmit identifying and interaction information to Meta.

66. Specifically, CAPI operates by sharing personal information stored on the website owner's server, such as Defendant's server, and transmits identifying information such as name, email address, or any other personal information the website owner configures it to transmit.

67. Indeed, Meta markets CAPI as "designed to create a direct connection between [Web hosts'] marketing data and [Meta]."[24] CAPI collects PII stored on the website host's server and sends such PII directly from Defendant to Meta.

68. Because CAPI is a server side technology, a user's attempts to thwart such privacy violations are rendered ineffective. Meta suggests website owners should use CAPI alongside the Pixel because it allows the host "to share website events [with Meta] that the pixel may lose."[25] Thus, it is reasonable to infer that Meta's customers who install the Meta Pixel—such as Defendant—will likewise implement the Conversions API consistent with Meta's advice.

> d. *Defendant's Disclosure of PII to Meta was Knowing*

69. Defendant operates its Website in the U.S., accessible from a computer browser at https://www.nurse.com/. Defendant, and Defendant alone, is responsible for the creation, configuration, and maintenance of its website.

70. Defendant purposefully installed and programmed the Pixel within its Website operation, thus making the knowing choice to share subscribers' PII with Meta.

---

[24] Business Help Center, *About Conversions API*, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last accessed January 24, 2025)
[25] *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Jan. 23, 2023).

71. At all relevant times, Defendant knew the Pixel discloses PII to Meta. This is evidenced by several things, including but not limited to: (i) the Pixel has one, singular purpose: to collect interactions related to specific users; (ii) the Pixel's purpose is well documented and even better publicized; and (iii) the manner in which Defendant configured its Pixel demonstrates it possesses a sophisticated understanding of this technology.

72. In addition, Defendant advertises on the Facebook platform, making its installation of the Pixel even more understandable as the technology made it easier to Defendant's ads to reach individuals with demonstrated interests aligned with Defendant's advertising, *and* allowed Defendant to determine which of those individuals followed such ads to the website and obtained a subscription.

    i.   *Meta Thoroughly Explains the Pixel's Purpose and its Function*

73. Defendant obtained the base code[26] necessary to install the Pixel from Meta's online business portal, which provides substantial literature about the pixel's purpose and function. In addition, to obtain the base code, Defendant was required to agree to Meta's Business Tools Terms which unambiguously inform business partners, like Defendant, that the Meta ad products (such as the Pixel) (i) are used for advertising and matching purposes, (ii) collect personally identifiable information about individuals, (iii) combine user identification information with event data, (iv) attribute advertising impressions with conversion, (v) and targets advertising campaigns to people who interact with the online business.[27] The Meta Business Tools Terms clearly inform entities using the business tools that the products are used to identify unique individuals and their specific

---

[26] Meta for Developers, *Get Started*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/get-started (last visited October 15, 2024).

[27] Meta, Business Tools Terms, https://www.facebook.com/legal/technology_terms (last accessed January 28, 2025).

interactions on websites that use the business tools, and that Meta uses this information to target advertising to them.

74.     By using the Meta Pixel, Defendant agreed to send and knowingly did send "contact information," defined as "information that personally identifies individuals, such as names, email addresses, and phone numbers, that [Meta] uses for matching purposes," as well as "event data," defined as "information that you share about people and the actions that they take on your websites," instructing Meta to process that contact information and corresponding event data to match with User IDs on Meta products.[28]

75.     Meta's literature about the Pixel is not cryptic: Meta clearly illustrates that the Pixel identifies specific online users, the specific actions they take on a website, and that Meta will use the information to target the specific user with specific advertising content:

> "The Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website…. Once you've set up the Meta Pixel, the pixel will log when someone takes an action on your website…. The pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. *You'll also have options to reach those customers again through future Meta ads*."[29] (emphasis added)

76.     In its "Get Started" page, Meta explains "[b]y default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."[30] In addition, website operators can also program their Pixel to track "conversions" (website visitor actions)[31] which are sent to the

---

[28] *Id.*

[29] Meta Business Help Center, *About Meta Pixel*, Meta https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited November 4, 2024).

[30] Meta for Developers, *Get Started*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/get-started (last visited October 15, 2024).

[31] *Id.*

Facebook Ads Manager and the Facebook Events Manager to be used to analyze the effectiveness of ad campaigns and to define custom audiences to adjust and create new campaigns.[32]

77. Meta's "Get Started" page further explains how it can identify website visitors and match them to their Facebook pages: "[The Meta Pixel] relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."

78. The purpose of the Meta Pixel – tracking and sending website visitor activity to Meta to match with the visitor's Facebook account – is thoroughly explained.

      ii.    *Defendant's Pixels Demonstrate it Understands How the Pixel Works*

79. No website *needs* to install the Pixel on its website – a Pixel does not facilitate any necessary website operations whatsoever. But embedding the Pixel within a website's code enables a business, like Defendant, to benefit from the collection of measurable data that details how users interact with their websites, such as whether users initiate purchases on the website, what items they view, and, relevant here, the prerecorded audio visual material users request or obtain on a specific webpage.

80. In particular, Defendant's Pixel is configured to collect "Button Click" data, which betrays the possibility that Defendant is ignorant to this technology: Button Click tracking is not a default category tracked by the Pixel. Indeed, that Defendant's Pixel tracks this "event" is further evidence of its understanding of this technology because it must be affirmatively selected before

---

[32] Meta for Developers, *Conversion Tracking*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited November 4, 2024).

the Pixel will record and transmit such events to Meta. "Button Click" data tracks which buttons or links subscribers click and when they do so.



*Figure 6*

81. The presence of settings on Defendant's Pixel beyond the default settings demonstrates that Defendant possesses a sophisticated understanding of this technology, its purpose, and how it works.

82. Meta's own literature illustrates that it developed advertising technology which sorts unique online users into custom audiences, and that its ability to create such audiences comes from data it obtains about specific, unique individuals visiting websites that host its data collection tools, such as Defendant.

83. While Defendant's Pixel was operational on its Website, Defendant knew that (i) the Pixel shared information which allowed Meta to uniquely identify the individuals interacting with Defendant's Website; (ii) the Pixel identified the specific interactions users took on its

website—including the specific videos they requested or obtained[33]; and (ii) that its Pixel collected and shared these items from subscribers to its website.

84.     Defendant chose, programmed, and intended for Meta to receive the video content name and the subscriber's FID, and that the Meta Pixel disclosed its subscribers' personal viewing history to Meta.

85.     Because its product is one of the best, Defendant had good reason to install Meta's advertising technology: in fact, as is *thoroughly* described by the materials Meta publishes about its advertising technology, Defendant not only *knew* the Pixel would share the above information with Meta – ***Defendant was counting on it***.

## PLAINTIFF-SPECIFIC ALLEGATIONS

86.     Plaintiff LynnAnn Ware has been a subscriber of Defendant's since 2018. Plaintiff Ware has also been a Facebook user with a unique Facebook profile page during the entire class period.

87.     When she created her Facebook profile, Meta required Plaintiff Ware to provide: her name, date of birth, gender, contact information, and password. In exchange for providing her personal information, Plaintiff Ware was granted access to audio visual materials unavailable to the general public.

88.     Defendant used the information Plaintiff Ware submitted when establishing her account to contact her during the class period, such as through sending her promotional emails to her email address.

---

[33] Relias knew Meta could learn the titles of the videos requested or obtained by its users because Relias—not Facebook—created the naming conventions for its URLs, and, as depicted by *Figure 6*, its URLs include the title of the videos available on the website accessed by users.

89.     During the relevant period, Plaintiff Ware's Facebook profile included publicly-available information specifically and uniquely identifying her, including but not limited to her full name, education, and photographs of herself and her family. Any person could use Plaintiff Ware's unique FID to link directly to her Facebook page and view this publicly available, uniquely identifying information.

90.     When Plaintiff Ware requested or obtained prerecorded audio visual material, Relias collected other categories of information from her as well, including her device identifiers, her IP address, and information about her browser.

91.     Plaintiff Ware created her account on nurse.com to request or obtain prerecorded audio visual content, and by registering her account she gained access to audio visual content exclusively available to subscribers.

92.     In the two years preceding this action, Plaintiff Ware requested or obtained prerecorded audio visual material on the Website from her computer browser. Specifically, Plaintiff requested or obtained prerecorded audio visual material for her state nursing license requirements, including the course "Heroin: The Opioid Crisis."

93.     While Plaintiff Ware was viewing Defendant's audio visual material using her browser, she was logged into her Facebook account from the same browser.

94.     Plaintiff Ware did not consent to Defendant's disclosure of her PII to third parties, including Meta.

95.     Just as depicted in the Allen Carney exemplars in *Figures* 3-6 above, Defendant disclosed to Meta the titles of the prerecorded audio visual materials Plaintiff Ware requested or obtained along with the c_user cookie containing her FID, which is directly linked to Plaintiff's personal Facebook profiles, in the same network transmission.

96. Each time Defendant disclosed Plaintiff's personally identifiable information to Meta, the disclosure was knowing and deliberately done to increase Defendant's opportunities to display effective advertising to Plaintiff and users like Plaintiff in the future.

97. Each time Defendant knowingly disclosed Plaintiff's PII to Meta, it violated their rights protected by the VPPA.

## TOLLING

98. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the conduct and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Classes were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

99. Plaintiff and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were acting unlawfully and in the manner alleged herein. As alleged herein, the representations made by Defendants were material to Plaintiff and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and members of the Classes could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

100. Defendants knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiff and members of the Classes reasonably relied on Defendants' concealment.

101. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

102.     Plaintiff brings this lawsuit under the Rules 23(a) and (b) of the Federal Rules of

Civil Procedure on behalf of the following Class:

> All persons in the United States who requested or obtained
> prerecorded audio visual material through their subscription to
> Defendant's Website and were logged into their Facebook profile
> during the period the Pixel was active on Defendant's Website.

103.     The "Class Period" is from January 31, 2025, to the present.

104.     Excluded from the Class is Defendant, any controlled person of Defendant, as well

as the officers and directors of Defendant and the immediate family members of any such person.

Also excluded is any judge who may preside over this cause of action and the immediate family

members of any such person. Plaintiff reserves the right to modify, change, or expand the Class

definition based upon discovery and further investigation.

105.     **Numerosity**: The Class consists of at least hundreds of individuals, making joinder

impractical.

106.     **Commonality and Predominance**: Common questions of law and fact exist with

regard to the claim and predominate over questions affecting only individual Class members.

Questions common to the Class include:

A.     Whether Defendant knowingly disclosed Plaintiff's and Class members' PII to

Meta;

B.     Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C.

§ 2710; and

C.     Whether Defendant should be enjoined from disclosing Plaintiff's and Class

members' PII.

107. **Typicality**: Plaintiff's claims are typical of the claims of the members of the proposed Class because, among other things, Plaintiff and members of the class sustained similar injuries from Defendant's uniform wrongful conduct, and their legal claims arise from the same events of wrongful conduct by Defendant.

108. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and Plaintiff has no interests antagonistic to those of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases.

109. **Predominance and Superiority**: Plaintiff satisfies the requirements of Rule 23(a) as well as the requirements for maintaining a class under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to individual plaintiffs is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents the potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

110. **Injunctive Relief**: Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

111. **Particular Issues.** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

### CAUSE OF ACTION
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710

112. Plaintiff incorporates and reallege the above factual allegations by reference.

113. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

114. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering prerecorded audio visual materials and those sales affect interstate or foreign commerce. Specifically, Defendant operates the Websites which host videos accessible by website visitors, and the audio visual material is related to Defendant's business (as opposed to an unrelated third party) and makes up part of Defendant's business.

115. As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are subscribers to Defendant's service who requested or obtained prerecorded audio visual material. Specifically, Plaintiff and Class members provided Defendant with personal information and/or payment in exchange for receipt of information and/or content from Defendant,

some or all of which became available by virtue of their provision of personal information to Defendant. The provision of information allowed Defendant to identify them and contact them. Thus, Plaintiff and Class members are "consumers" under this definition.

116.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

117.    Defendant knowingly disclosed Plaintiff's and Class members' PII—specifically, their FIDs in conjunction with the title and URL of the prerecorded audio visual material they requested or obtained in a single transmission—to Meta.

118.    This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Meta as having requested or obtained Defendant's prerecorded audio visual material, including the specific prerecorded audio visual materials requested or obtained on Defendant's Website. Indeed, Meta (or an ordinary person possessing a class member's FID) can identify the individual associated with a FID simply by entering "Facebook.com/[FID]" into a web browser.

119.    Defendant never obtained from Plaintiff, or any Class member, informed, written consent. More specifically, Defendant never obtained from Plaintiff or any Class member, informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiff or any Class member, informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiff or any Class member to withdraw

consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

120.     Defendant's disclosures were made knowingly: it programmed the Pixel into its Website code knowing that doing so would disclose to Meta the titles of the prerecorded audio visual materials, knowing the Pixel would disclose the FIDs pertaining to any subscriber who requested or obtained a prerecorded audio visual material, and knowing Meta would use the information about the videos individuals watched to retarget advertising to them on Defendant's behalf.

121.     By disclosing Plaintiff's and the Class members' PII, Defendant violated Plaintiff's and Class members' statutorily protected right to request or obtain prerecorded audio visual materials in private. 18 U.S.C. § 2710(c).

122.     Plaintiff and Class members have suffered loss by reason of Defendant's violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, and the inequity of Defendant's enrichment by means identifying information pertaining to Plaintiff and Class members without authorization or consent.

123.     As a result of these violations, Defendant is liable to Plaintiff and Class members.

124.     On behalf of herself and all members of the Class, Plaintiff seeks to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; reasonable attorneys' fees and costs; and all other preliminary or equitable relief the Court deems appropriate. 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

i.        Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

ii.      Find that Defendant's actions, as described herein, constitute violations of the VPPA;

iii.     Enter judgment in favor of Plaintiff and the Class;

iv.     Enter an order permanently enjoining Defendant from disclosing PII to third parties in violation of the VPPA;

v.       Award Plaintiff and Class members the actual and/or statutory damages to which they are entitled under the VPPA;

vi.     Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

vii.    Award all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action; and

viii.   Award such other legal and equitable relief as the Court deems necessary and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: January 31, 2025             Respectfully submitted,

                                    */s/ Scott Harris*
                                    Scott Harris (NC Bar 35328)
                                    sharris@milberg.com
                                    **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                    900 West Morgan Street
                                    Raleigh, NC 27603
                                    Telephone: (919) 600-5003

Allen Carney (*pro hac vice* forthcoming)
acarney@cbplaw.com
Samuel Randolph Jackson (*pro hac vice* forthcoming)
sjackson@cbplaw.com
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorneys for Plaintiff and the Class*